NO. 7642.

HENRY R. GUERIN ET UX.

VS

AUGUST HUBERWALD.

STATE OF LOUISIANA

COURT OF APPEAL

PARISH OF ORLEANS.

7642

# OPINION.

By his Honor John St. Paul;

This is an action for damages by a husband and wife, against a druggist for alleged negligence in labeling a prescription, in consequence whereof the wife, having used the medicine according to the directions indicated, instead of as intended by her physician, suffered certain alleged physical and mental injuries, and the husband was thereby put to certain alleged expenses. The answer is substantially a general denial.

## I.

At the time of the occurences hereinafter mentioned the wife was pregnant, and five months of her period had gone by. Having on two former occasions suffered a miscarriage, she had kept herself under the careful observation of her family physician, who up to that time had found no indication of any threatened mishap.

But as the result of her condition she had some pain in her limbs, and besides had contracted a slight cough. To relieve the pain in her limbs the physician prescribed a liniment containing a trace of Menthol, and equal quantities of Oil of Wintergreen and of Olive Oil, with direction to "Apply" locally, For the cough he prescribed Wild Cherry and Codeine, with directions to take "A teaspoonful every three hours when coughing."

The two prescriptions were filled at defendant's drug
store, and were handed to the husband in one package. It
is not disputed that they were correctly filled.

Arriving at home the husband gave the two bottles to
his wife, who after having read the labels then took and
swallowed a teaspoonful of the contents of that bottle
which bore the label with directions to take "a teaspoonful
every three hours," with the alleged results hereinafter
mentioned.

II.

It is an undisputed fact that when the two bottles
were produced in court, the cough mixture bore a label direct-
ing local applications, and the liniment a label directing
that a teaspoonful be taken every three hours. The attending
physician, whose good repute is not questioned, testifies
that when he first saw the two bottles, upon being called
in some few hours after the obnoxious dose was taken, they
were labeled as when produced in court. The husband, and a
friend who accompanied him, testified that the two bottles
were handed him in one package; the husband swears that he
handed the two bottles to his wife ~~as she received the~~
~~bottles~~ as he received them. The wife swears that she received
the bottles from her husband and having merely examined the
labels to ascertain which was which, she took a teaspoonful

134

of the mixture contained in that one of the bottles labeled
"a teaspoonful every three hours."

Defendant's manager, who saw the bottle of liniment
in court, Mislabeled, admits that it came from defendant's
establishment, but "won't admit that that is the label
which was on the bottle when it was sent out."

The point is not insisted upon; and we ourselves, in
the light of the evidence before us, the proverbial
uncertainty of law suits, and the well known danger of
takinginternally the unknown contents of lotions intended
for external use only, will not assume that the labels were
"switched" otherwise than by some negligence on the part of
one of the defendant's employees. In the face of direct
evidence leading to a conclusion not impossible or absurd,
courts will not indulge in fanciful theories which, though
possible are yet not even suggested by the evidence and in
themselves highly *improbable*. Sanchez vs Woodmen of World,
13 Orleans Appeal. 24?; Temourelle vs Pittsburg Plate Glass
Co, 13 Orleans App. 374; Block vs Ocean Ins Co, 10 Orleans
App 284; 143; Von Buelow vs Life Insce Co, 9 Orleans app 143.

### III.

The wife testifies that immediately upon taking the
obnoxious dose she felt a burning sensation throughout her
whole body, that she gradually grew worse, and some hours
afterwards called in the physician who found premonitions

135

of another miscarriage and accordingly ordered her to bed at once. There she remained three weeks showing all the well known signs of an approaching miscarriage (which however gradually subsided) and with the dread upon her that such an occurence was impending; that it was another three weeks before all immediate danger thereof had passed. In this she is corroborated by her husband and by the physician.

IV.

The attending physicain testifies that the burning sensation was caused by the small (negligible) quantity of Menthol; that the sensation was purely local, and had no bad effect upon her, except psychologically, when she realized that in her condition she had swallowed something not intended for her stomach in its then delicate condition; but that the Oil of Wintergreen which she had taken was the exciting cause which set in motion her own predisposition towards miscarriage. (NOTE; The exciting cause of an occurence is the one which sets the other causes in motion]; it is therefore the efficient or proximate cause. Inse Co vs Boon # 95 U. S. 117; Lapleine vs M. La & Tex R. R. Co, 4o Ann 661; Wellington vs Downer Kerosene Oil Co, 104 Mass 64; Vandenburg vs Truax, 4 Denio 464; And Scott vs Sheppard, 2 Wm Blackstone 892, the celebrated and oft cited case of the lighted squib thrown in the market place)

The physician also testified that the text books warn against the use of that drug during pregnancy, and he referred to Hare's "Practical Therapentics" (9th Edition, 1902) a text book long in use in the local Medical College; pointing especially to page 239 where it is said:it (Oil of Wintergreen, Gaultheria) is about 96 per cent salicylate of methyl, x x x Owing to the large amount of salicylate of methyl contained in the oil, its physiological action is <u>almost identical</u> <u>with That of salicylic acid</u>, x x x The dose may be as high as 100 minims <u>a day</u>, but xxx very few patients can take more than 30 minims <u>a day</u>, without suffering from a <u>disordered</u> <u>stomach</u>." NOTA BENE; At page 791 the dosage for oil of Wintergreen is given at from 1 to 20 minims; at page 783 oil of Gaultheria, dosage 2 to 10 minims.

The physician also pointed to (Hare) page 384, where it is said "BINZ thinks that full doses of Salicylic acid (p. 777, dosage 5 to 15 grains, and as aforesaid similar in its action to Gaultheria) may produce abortion in woman who already <u>have</u> <u>a tendency to abort</u>, and VINEBURG thinks that Meno<u>rr</u>hagia and Met<u>rr</u>orrhagia are caused by it (that is to say, Vineburg looks upon it as an Emmenagogue) x x x Salicylic acid x x x is an <u>irritant</u> to the stomach."

The United States Dispensary (17th Edition, 1894) puts the percentage of salicylic acid *Salicylate of methyl* in oil of Wintergreen some-what lower than them 96 per cent. At pages 937-938, it is
137

said; "169 grains of the oil contain 152 grains of methyl salicylate and are therefore equivalent to 138 grains of salicylic acid;" this is about 81 per cent *salicylic acid*.

Observing this percentage, and noting that the minim or drop is the 60th part of a fluidrachm (fluid-drachm) and therefore the liquid equivalent of one grain (approximately), we see that 20 minims of (liquid) Wintergreen oil are the equivalent of 15 grains of (crystalized) salicylic acid, and that both are full doses.

Observing also that a teaspoonful is one fourth of a tablespoonful and therefore one eigth of a fluidounce, we see that it contains just one fluidrachm, or sixty minims; and hence we find that when the lady took a teaspoonful of the mixture, she took just THIRTY minims (drops) of the oil of Wintergreen, that is to say, at least 50 per cent more than a _full dose_.

## VI.

We do not know who BINZ and VINEBURG are; but when we find that a text book used in a Standard Medical College, and therefore daily in the hands of skilled professors, refers to them simply by their patronymics, we may fairly assume that they *have* some weight as authorities; just as a layman, reading one of our own text books, and meeting such expressions as, "Pothier is of opinion x x x, Blackstone holds x x x, Kent thinks x x x, etc", might justly conclude

that these authors, though perhaps unknown to him, are entitled to some respect in the domain of law.

## VII.

But whatever be the weight to be given to Binz and Vineburg as medical authorities, it is certain that they are quite in accord with authors with whom we are better acquainted.

Wharton and Stille's Medical Jurisprudence (1905), page 49 and 50 (Sections 82 to 86), tells us in substance that the use of drugs _for the purpose_ of causing abortion has been _practically_ without success; and the reason is obvious, as "only one or two have produced abortion _without causing the death of the woman_", or at least the symptoms of intense poisoning; but that _Irritants_, _Purges_ and _Emmenagogues_ MAY produce abortion, the first two by their _secondary_ effects, and the last by their _direct action_ on the uterus. To the same effect see Beck's Medical Jurisprudence (1850) Volume 2 page 428 to 475, which adds that a _predisposition_ to miscarriage and other circumstances are factors in the result produced.

## VIII.

Against this we have only the "ipse dixit" of another physician, called as an expert, that in his opinion oil of Winteggreen could not have produced the effect hereinabove ascribed to it, and that there is no drug known to medicine

139

capable of causing abortion unaided by mechanical means.

If we are to understand by this that oil of Wintergreen is not appropriate to the purpose of bringing on premature parturition legitimate (?) or otherwise; and that there is no drug whose action in that respect is certain in its result and altogether unattended by danger to the woman herself, then the witness is quite in accord with the authorities.

If however we are to understand therefrom that there can be no connection between the lady's illness and the drug which she swallowed, then we cannot accept his unsupported opinion against that of the attending physician, supported as it is by the authorities above set forth; not only because he finally declines to commit himself quite so far, but also for other reasons into which we will not enter; and again because in matters of this nature, the opinion of the attending physician is entitled to greater weight than that of others who have not seen the patient, and whose fine-spun theories are often utterly destroyed by grim and stubborn facts. Mc Cubbin vs Hastings, 27 An 713; Walton vs Booth, 34 An 913; Fleet ## & Semple vs Hollenkamp, 13 Ben Monroe (Ky) 219.

## IX.

As to the Quantum, we find that plaintiffs have established special damages as claimed, towit $97; and for the pain and suffering (mental and physical) of the

140

wife we think the further sum of $100 should be just compensation. Even if this amount be not exact, it is still allowable for the violation of plaintiffs legal rights, even though unattended by circumstances indicating any wantonness. Davis vs Ry Co, 117 La 320; Bourdette vs Seeward, 107 La 258; Green vs Dairy Co, 113 La 89; Orlesch vs Auto Co, 13 Orleans App 303. For Druggists and Apothecaries are <u>insurers</u> of the compounds they make up for sale. 13 Ben Monroe 219 (Supra); Doyle vs Fuerst & Kraemer, 8 Orleans App 408 (129 La 838).

The judgment appealed from is therefore reversed, and it is now ordered that there be judgment in favor of the plaintiffs Mr. and Mrs. Henry R. Guerin, and against the defendant August Huberwald, for the full sum of One hundred and Ninety seven Dollars ($197) with legal interest from judicial demand until paid, and the costs of both courts.

New Orleans La, January     1920